PITTMAN, Judge.
Porter Capital Corporation (“Porter Capital”) and Porter Bridge Loan Company, Inc. (“Porter Bridge”), appeal from an order of the Jefferson Circuit Court denying their motions to compel arbitration of the counterclaims asserted against them by Dennis R. Thomas, M.D. We affirm.

Factual and Procedural Background

On October 10, 2007, Porter Capital entered into a commercial-financing agreement and a security agreement with Ath-lon Pharmaceuticals, Inc. (“Athlon”). Pursuant to those agreements, Porter Capital agreed to provide Athlon with accounts-receivable financing and to authorize loan disbursements up to $8.5 million on a revolving line of credit. Athlon granted Porter Capital a security interest in its personal property, trade fixtures, inventory, and equipment. In addition to the financing agreement and the security agreement, Porter Capital and Athlon also executed a stand-alone arbitration agreement (“the first arbitration agreement”) on October 10, 2007.
On the same day, Thomas, a Mobile physician who is a 5% shareholder of Ath-lon, executed a guaranty of Athlon’s obligations under the commercial-financing agreement. The guaranty agreement included the following provision:
“19. No Jury Trial — [Thomas] hereby irrevocably and unconditionally waives, and Porter Capital by its acceptance of this Guaranty irrevocably and unconditionally waives, any and all right to trial by jury in any action, suit or counterclaim arising in connection with, out of or otherwise relating to this Guaranty.”
Thomas did not sign an arbitration agreement on October 10, 2007.
On December 13, 2007, Porter Capital, Athlon, and Thomas executed a “Restated and Amended Commercial Financing Agreement” reflecting that Thomas had provided, as additional collateral securing Porter Capital’s future advances to Athlon, a mortgage in the amount of $1.4 million on his principal residence in Mobile. On January 30, 2008, Athlon executed a promissory note in the amount of $1 million to Porter Capital; Porter Capital subsequently assigned the note to Porter Bridge. On April 3, 2008, Porter Capital, Athlon, and Thomas executed a second “Restated and Amended Commercial Financing Agreement,” reflecting that Thomas had provided, as additional collateral securing Porter Capital’s future advances to Athlon, a second mortgage in the amount of $1.5 million on commercial property in Madison, Mississippi. In connection with the April 3, 2008, transaction, Thomas signed an arbitration agreement (“the second arbitration agreement”).
In July 2008, Thomas refinanced the mortgage on the Mississippi property and made a payment of $2.4 million on Athlon’s indebtedness to Porter Capital. Neither Athlon nor Thomas made any further payments to Porter Capital, and in September 2008 Athlon filed a petition in the United States Bankruptcy Court for the Southern *1212 District of Mississippi, seeking relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 et seq.
On July 24, 2009, Porter Capital filed an action in the Jefferson Circuit Court against Thomas, alleging breach of the guaranty agreement. On September 28, 2009, Thomas answered and counterclaimed, alleging breach of fiduciary duty and breach of the duty of good faith and fair dealing and demanding a jury trial on those claims. On the same day, Thomas issued a deposition notice to Ron Williamson, Porter Capital’s vice president. On October 8, 2009, Porter Capital answered the counterclaims, asserted various affirmative defenses, and issued a deposition notice to Thomas. On October 13, 2009, Porter Capital filed an amended complaint adding Porter Bridge as a plaintiff; both plaintiffs then moved to strike Thomas’s jury demand, citing the jury-waiver provision of Thomas’s guaranty agreement. Thomas deposed Williamson, Porter Capital’s vice president, on October 28, 2009.
On January 20, 2010, the circuit court granted Porter Capital’s motion to strike Thomas’s jury demand. On May 11-12, 2010, Thomas deposed Williamson for the second time. On May 17, 2010, Porter Capital deposed Thomas. In September 2010, counsel for Porter Capital and Porter Bridge submitted a proposed scheduling order to opposing counsel. On November 18, 2010, Porter Bridge moved to strike Thomas’s jury demand.
On December 13, 2010, Thomas filed a second amended counterclaim, again alleging claims of breach of fiduciary duty and breach of the duty of good faith and fair dealing, but adding the following new claims, for which he sought compensatory and punitive damages and demanded a jury trial: (1) that Athlon was a mere instrumentality of Porter Capital and Porter Bridge; (2) that Porter Capital and Porter Bridge had liquidated Athloris personal property in a commercially unreasonable manner; (3) that Porter Capital and Porter Bridge had made false representations of material fact in order to induce him to guarantee Athloris loan and to increase the collateral securing that loan, which misrepresentations, Thomas alleged, he had discovered during the depositions of Williamson on October 28, 2009, and May 11-12, 2010; (4) that Porter Capital and Porter Bridge had fraudulently suppressed information that, Thomas said, they had been required to communicate to him, which information, he asserted, he had also discovered during the. depositions of Williamson; (5) that Porter Capital and Porter Bridge had negligently or wantonly disclosed his personal financial information to banks without his authorization; and (6) that such disclosures violated his right of privacy.
On March 9, 2011, Porter Capital and Porter Bridge moved to compel arbitration or, in the alternative, to strike Thomas’s third jury demand. Thomas responded to the motion on April 20, 2011, alleging that there was no arbitration agreement applicable to his counterclaims and that, even if there were such an agreement, Porter Capital and Porter Bridge had waived their right to arbitration by substantially invoking the litigation process. Thomas asserted that the issue of arbitration had not been raised in any pleading until March 9, 2011, 20 months after the parties had been actively litigating the case; that he had paid legal fees and expenses of more than $67,000 (of which approximately $5,000 had been costs related to depositions and filing fees); and that he would be substantially prejudiced if he were required to arbitrate his claims. Following a hearing on April 22, 2011, the circuit court entered an order on May 2, 2011, (a) denying the motion to compel arbitration and *1213 (b) granting in part and denying in part the motion to strike Thomas’s jury demand.[1]
Counsel for Porter Capital and Porter Bridge did not learn of the entry of the May 2, 2011, order until June 28, 2011. On July 8, 2011, counsel moved for relief from the order pursuant to Rule 60(b), Ala. R. Civ. P., or, in the alternative, for an extension of time to file a notice of appeal, pursuant to Rule 77(d), Ala. R. Civ. P. On July 13, 2011, the circuit court denied the Rule 60(b) motion and granted the Rule 77(d) motion, extending the time for appeal to July 13.[2] Porter Capital and Porter Bridge appealed to the Supreme Court of Alabama on July 13, 2011. The supreme court transferred the appeal to this court pursuant to § 12-2-7(6), Ala.Code 1975.

Standard of Review

“[An appellate court reviews] de novo the trial court’s grant or denial of a motion to compel arbitration. Bowen v. Security Pest Control, Inc., 879 So.2d 1139, 1141 (Ala.2003). Initially, the party seeking to compel arbitration has the burden of proving the existence of a contract calling for arbitration and proving that that contract evidences a transaction involving interstate commerce. Polaris Sales, Inc. v. Heritage Imports, Inc., 879 So.2d 1129, 1132 (Ala.2003). The moving party ‘must “ ‘produce some evidence which tends to establish its claim.’ ” ’ Wolff Motor Co. v. White, 869 So.2d 1129, 1131 (Ala.2003)(quoting Jim Burke Auto., Inc. v. Beavers, 674 So.2d 1260, 1265 (Ala.1995), quoting in turn In re American Freight Sys., Inc., 164 B.R. 341, 345 (D.Kan.1994)). Once the moving party has properly supported his or her motion to compel arbitration, the burden then shifts to the nonmovant to present evidence tending to show that the arbitration agreement is invalid or inapplicable to the case. Polaris Sales, 879 So.2d at 1132.”
Edwards v. Costner, 979 So.2d 757, 761 (Ala.2007).

Discussion

Porter Capital and Porter Bridge (hereinafter collectively referred to as “the lenders”) argue on appeal, as they did in the circuit court, that Thomas’s counterclaims are subject to arbitration under both the first and the second arbitration agreements. The lenders acknowledge here, as they did in the circuit court, that initially they waived arbitration by substantially invoking the litigation process. Nevertheless, employing the same argument that they advanced in the circuit court, the lenders point out that our supreme court has specifically recognized that a waiver of the right to arbitrate can be revoked under extraordinary circumstances — such as when unexpected events occur during the course of the litigation— that necessitate a determination that the right to arbitrate has been revived.[3] The *1214 lenders contend that this is such a case because, they say, Thomas’s second amended counterclaim adding six new claims against the lenders significantly changed the nature and course of the litigation.
In its May 2, 2011, order, the circuit court limited its consideration to the first arbitration agreement, stating that the lenders “do[] not [base their motion to compel] on the [second] April 3, 2008, agreement, but instead argue[ ] that [their] motion to compel is based on the [first] October 10, 2007, agreement to which Thomas was not a party.” The lenders clearly relied upon both agreements, and the circuit court was mistaken in stating otherwise.
The circuit court concluded that Thomas was not bound by the first arbitration agreement because he was a nonsignatory. The circuit court did not reach the waiver issue or the revocation-of-waiver and revival issue because, having determined that the first arbitration agreement did not apply to Thomas and that the second arbitration agreement was not argued as a basis for the motion to compel, there was no basis for compelling arbitration in this case.
The lenders maintain that the circuit court erred in determining that Thomas was not bound by the first arbitration agreement; that the circuit court erred in failing to consider the second arbitration agreement and to determine that it required arbitration of Thomas’s counterclaims; and that, although the lenders initially waived the right to arbitration, their waiver was later revoked and their right to arbitration was revived after Thomas filed the second amended counterclaim.
I. The First Arbitration Agreement
The parties do not disagree that the underlying transaction involves interstate commerce. They disagree about the existence of a contract calling for arbitration of Thomas’s claims against the lenders. “ ‘ “ ‘[Arbitration is a matter of contract, and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.’ ” ’ ” Custom Performance, Inc. v. Dawson, 57 So.3d 90, 97 (Ala.2010) (quoting Central Reserve Life Ins. Co. v. Fox, 869 So.2d 1124, 1127 (Ala.2003), quoting in turn AT & T Techs., Inc. v. Commc’ns Workers of America, 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986), quoting in turn United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)). “A party typically manifests its assent to arbitrate a dispute by signing the contract containing the arbitration provision.” Smith v. Mark Dodge, Inc., 934 So.2d 375, 380 (Ala.2006).
In the present case, it is undisputed that Thomas did not sign the first arbitration agreement on October 10, 2007. That stand-alone agreement was signed only by a representative of Athlon (hereinafter referred to as “the borrower”).
“ ‘Generally, “a nonsignatory to an arbitration agreement cannot be forced to arbitrate [his] claims.”’ Edward D. Jones & Co. v. Ventura, 907 So.2d 1035, 1042 (Ala.2005) (quoting Cook’s Pest Control, Inc. v. Boykin, 807 So.2d 524, 526 (Ala.2001)). However, arbitration agreements may be enforced against a nonsignatory third party under either a third-party-beneficiary theory or an intertwined-claims theory.”[4]
*1215 Edwards v. Costner, 979 So.2d 757, 763 (Ala.2007).
“ ‘[I]n order for a person to be a third-party beneficiary of a contract, the contracting parties must have intended to bestow benefits on third parties.’” Edwards v. Costner, 979 So.2d at 763 (quoting Locke v. Ozark City Bd. of Educ., 910 So.2d 1247, 1251 (Ala.2005)). The intended benefits must be “ ‘direct, as opposed to ... incidental.’ ” Ex parte Dyess, 709 So.2d 447, 450 (Ala.1997) (quoting Weathers Auto Glass, Inc. v. Alfa Mut. Ins. Co., 619 So.2d 1328, 1329 (Ala.1993)). With respect to the third-party-beneficiary issue, the circuit court determined:
“The loan agreement of October 10, 2007, which is at the basis of the case before the court, was a transaction that benefitted [the borrower] directly and only indirectly benefitted [Thomas] as one of its shareholders. Though counsel argued to the court during the course of oral arguments that [Thomas] was a principal investor and had committed more of his funds, comparably, than had any of the other shareholders, to the corporate enterprise, the direct beneficiary of the transaction remained the corporate entity. Shareholders benefit only indirectly from benefits bestowed upon corporate entities in which shareholders have a stake, even a sizable stake.”
The lenders argue that the circuit court erred in concluding that Thomas was not a third-party beneficiary of the commercial-financing agreement between Porter Capital and the borrower. The lenders contend that, because Thomas was the borrower’s shareholder who pledged almost $3 million in security for the borrower’s loan — a shareholder who stood to benefit if the loan enabled the borrower to become financially successful, and, likewise, who risked the loss of valuable assets if the borrower defaulted on the loan — Thomas had a direct economic interest in the financing agreement between Porter Capital and the borrower.
The lenders contend that the circuit court’s determination is contrary to the express terms of the guaranty agree *1216 ment that Thomas signed on October 10, 2007, in which Thomas acknowledged that he had a “direct economic interest” in being a guarantor of the borrower’s loan. Paragraph 9 of the guaranty agreement states:
“9. Guarantor’s Direct Benefit — The undersigned hereby represent and warranty that it is in their direct economic interest to assist the Company because of the undersigned’s position(s) in and/or economic relation(s) with the Company.”
The recital in paragraph 9 that Thomas considered it in his economic interest to guarantee the borrower’s loan is not determinative. A guarantor does not gain third-party-beneficiary status because he intends to be directly benefited by his guaranty of a borrower’s obligations to a lender; if he gains that status, it is because the lender and the borrower — the contracting parties — intended, at the time they executed their contract, to bestow a direct benefit on the guarantor. Cf. UBS Fin. Servs., Inc. v. Johnson, 943 So.2d 118, 122 (Ala.2006) (“Absent a showing that [financial-services firm] and [its customer] intended to benefit [the customer’s sister] when they executed the agreement on opening [the customer’s] account, [the customer’s sister] cannot be considered a third-party beneficiary.... Therefore, [the customer’s sister] is not bound by the arbitration provision of the agreement between [the financial-services firm] and [its customer].”).
In the present case, nothing in the loan documents executed by the lenders and the borrower indicates that those parties intended to bestow a direct benefit on Thomas. Accordingly, any benefit to Thomas was incidental, as opposed to direct. See, e.g., McKinney-Green, Inc. v. Davis, 606 So.2d 393 (Fla.Dist.Ct.App.1992) (holding that proposed guarantor, a 50% shareholder of subdivision corporation, was merely an incidental beneficiary of corporation’s construction-loan agreement with mortgage broker); Numerica Sav. Bank, F.S.B. v. Mountain Lodge Inn Corp., 134 N.H. 505, 596 A.2d 131 (1991) (holding that guarantor, a 50% shareholder of corporation, was not a third-party beneficiary of corporation’s original construction-loan agreement with bank); and Johnston v. Oregon Bank, 285 Or. 423, 591 P.2d 746 (1979) (holding that guarantor, the managing director and principal owner of stock in corporation that was a partner in lumber company, was only an incidental beneficiary of lumber company’s loan agreement with bank).
The circuit court did not err in determining that Thomas was not a third-party beneficiary of the contract between the lenders and the borrower and, therefore, that the first arbitration agreement was not a “contract calling for arbitration” of Thomas’s counterclaims against the lenders. See Polaris Sales, Inc. v. Heritage Imports, Inc., 879 So.2d 1129, 1132 (Ala.2003).
II. The Second Arbitration Agreement
In order to determine whether the circuit court erred in denying the lenders’ motion to compel arbitration, we must decide whether Thomas’s counterclaims against the lenders fall within the scope of the second arbitration agreement — an agreement that Thomas signed but that the circuit court did not consider.[5]
*1217 “The dispute the movant seeks to arbitrate must fall within the scope of the arbitration agreement. See Cook’s Pest Control v. Boykin, 807 So.2d 524, 527 (Ala.2001) (arbitration not compelled where movant attempted ‘to enforce the [arbitration] clause beyond its scope’); W.L. Petrey Wholesale Co., [941 So.2d 234 (Ala.2006)] (claims not arbitrable because they fell outside the scope of the agreement containing the arbitration clause).”
Edwards Motors, Inc. v. Hudgins, 957 So.2d 444, 447 (Ala.2006). In Homes of Legend, Inc. v. McCollough, 776 So.2d 741 (Ala.2000), our supreme court discussed the presumptions and rules of construction that apply in determining the scope of an arbitration agreement. The court stated:
“Questions of arbitrability — that is, whether the parties agreed to submit their particular dispute to arbitration— ‘must be addressed with a healthy regard for the federal policy favoring arbitration,’ [Moses H. Cone Mem’l Hosp. v. Mercury Constr. Corp., 460 U.S. 1,] 24, 103 S.Ct. 927 [(1983) ]; but, in determining whether the parties agreed to arbitrate a dispute, [an appellate court] ‘should apply ordinary state-law principles that govern the formation of contracts.’ First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); accord Quality Truck & Auto Sales, Inc. v. Yassine, 730 So.2d 1164, 1167-68 (Ala.1999). Consequently, ‘in applying general state-law principles of contract interpretation to the interpretation of an arbitration agreement within the scope of the [Federal Arbitration] Act [ (‘FAA’) ], due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration.’ Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 475-76, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989) (citation omitted).
“However, the federal policy favoring arbitration does not require [an appellate court] to ignore the contractual intentions of the parties. See Volt Information Sciences, Inc., 489 U.S. at 478-79, 109 S.Ct. 1248; Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 57, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995). Instead, ‘[our supreme court] has clearly and consistently held that a party cannot be required to submit to arbitration any dispute he has not agreed to submit.’ Ex parte Stallings & Sons, Inc., 670 So.2d 861, 862 (Ala.1995) (internal quotation marks and citations omitted); accord AT & T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). The FAA ‘simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms,’ and ‘parties are generally free to structure their arbitration agreements as they see fit.’ Volt Information Sciences, Inc., 489 U.S. at 478-79, 109 S.Ct. 1248. Accordingly, ‘as with any other contract, the parties’ intentions control, but those intentions are generously construed as to issues of ar-bitrability.’ Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985).
“Under general Alabama rules of contract interpretation, the intent of the contracting parties is discerned from the whole of the contract. See Loerch v. National Bank of Commerce of Bir *1218 mingham, 624 So.2d 552, 558 (Ala.1993). Where there is no indication that the terms of the contract are used in a special or technical sense, they will be given their ordinary, plain, and natural meaning. See Ex parte Dan Tucker Auto Sales, Inc., 718 So.2d 33, 36 (Ala.1998). If the court determines that the terms are unambiguous (susceptible of only one reasonable meaning), then the court will presume that the parties intended what they stated and will enforce the contract as written. See id. at 36; Voyager Life Ins. Co. v. Whitson, 703 So.2d 944, 948 (Ala.1997). On the other hand, if the court determines that the terms are ambiguous (susceptible of more than one reasonable meaning), then the court must use established rules of contract construction to resolve the ambiguity. See Whitson, 703 So.2d at 948. Under those established rules of contract construction, where there is a choice between a valid construction and an invalid construction the court has a duty to accept the construction that will uphold, rather than destroy, the contract and that will give effect and meaning to all of its terms. See id. at 948-49; Sullivan, Long & Hagerty v. Southern Elec. Generating Co., 667 So.2d 722, 725 (Ala.1995). Additionally, ‘if there exists inconsistency between two clauses of a contract which cannot be reconciled, the inconsistency must be resolved in favor of the prior clause, unless an intention to thereafter qualify is plainly expressed.’ City of Fairhope v. Town of Daphne, 282 Ala. 51, 58, 208 So.2d 917, 924 (1968); see Whitson, 703 So.2d at 949. Last, if all other rules of contract construction fail to resolve the ambiguity, then, under the rule of contra proferen-tem, any ambiguity must be construed against the drafter of the contract. See Lackey v. Central Bank of the South, 710 So.2d 419, 422 (Ala.1998).”
Homes of Legend, 776 So.2d at 745-46.
The second arbitration agreement, a stand-alone document that Thomas signed on April 3, 2008, provided, in pertinent part:
“READ THIS AGREEMENT CAREFULLY. IT LIMITS CERTAIN RIGHTS, INCLUDING YOUR RIGHT TO GO TO COURT. In this agreement to arbitrate (this ‘Agreement’), (1) ‘Transaction’ means any one or more past, present, or future ... (c) extensions of credit ... from PORTER CAPITAL CORPORATION, its successors or assigns, (‘Lender’) to ATHLON PHARMACEUTICALS, INC. (‘Borrower’), including this Transaction, and (2) ‘Claim’ means any case, controversy, dispute, tort, disagreement, lawsuit, claim, or counterclaim, and other matters in question now or hereafter existing between Lender (including Lender’s corporate parent, affiliates, subsidiaries, agents, employees, lawyers, officers, directors, successors and assigns) and Borrower. A Claim includes, without limitation, anything arising out of, in connection with, or relating to: (a) this Agreement; (b) the advertisement, solicitation, application, processing, closing or servicing of this Transaction or any instruments executed in conjunction with it (collectively the ‘Loan Agreements’ including but not limited to the terms of the loan, representations, promises, undertakings or covenants made relating to the Loan, or Loan Agreements executed in conjunction with the Commercial Financing Agreement and the Security Instrument, services provided under the Loan Agreements, and the validity and construction of the Loan Agreements; (c) any Transaction; ... (f) any documents or instru *1219 ments that contain information about or document any Transaction, insurance, service, or product; and (g) any act or omission by Lender regarding any Claim.
[[Image here]]
“Claims Excluded from Arbitration. Notwithstanding the foregoing, neither Borrower, you, nor Lender can require the other to arbitrate ... (iii) any Claim where Lender seeks damages or other relief because of Borrower’s default under the terms of a Transaction. Enforcement of this section will not waive the right to arbitrate any other Claim, including a Claim asserted as a counterclaim in a lawsuit brought under this action.”
The scope of the second arbitration agreement turns on the construction of two sentences that define and describe the term “claim”:
Sentence One
“ ‘Claim’ means any case, controversy, dispute, tort, disagreement, lawsuit, claim, or counterclaim, and other matters in question now or hereafter existing between Lender (including Lender’s corporate parent, affiliates, subsidiaries, agents, employees, lawyers, officers, directors, successors and assigns) and Borrower.”
Sentence Two
“A Claim includes, without limitation, anything arising out of, in connection with, or relating to: (a) this Agreement; (b) the advertisement, solicitation, application, processing, closing or servicing of this Transaction or any instruments executed in conjunction with it (collectively the ‘Loan Agreements’ including but not limited to the terms of the loan, representations, promises, undertakings or covenants made relating to the Loan, or Loan Agreements executed in conjunction with the Commercial Financing Agreement and the Security Instrument, services provided under the Loan Agreements, and the validity and construction of the Loan Agreements; (c) any Transaction; ...(f) any documents or instruments that contain information about or document any Transaction, insurance, service, or product; and (g) any act or omission by Lender regarding any Claim.”
(Emphasis added.) As the emphasized words in Sentence One indicate, the first sentence is a definitional provision: a “claim” means a matter in controversy between the lender and the borrower. Likewise, as the emphasized words in Sentence Two indicate, the second sentence is a descriptive provision that enumerates several specific (but not all-inclusive) examples of things that qualify as a “claim,” without contradicting, in any manner, the definition set out in Sentence One, i.e., that a claim is a dispute between the lender and the borrower. There is no ambiguity, patent or latent, in the two sentences.
“ ‘If the meaning of the contract can be discerned through a plain reading, the court will not twist the language in order to create ambiguities.’ Shadrick v. Johnston, 581 So.2d 805, 810 (Ala.1991). The rule, applied by the federal courts, that ambiguities in arbitration clauses will be construed in favor of arbitration, arises only if there is an ambiguity.” Ex parte Hagan, 721 So.2d 167, 173-74 (Ala.1998) (emphasis added; footnote omitted).
“ ‘Where contract terms are unambiguous, [an appellate court does] not look beyond the plain language of the contract to second-guess the intentions of the parties; nor will [it] speculate about what may have been the subjective expectations of the parties. See Harbison v. Strickland, 900 So.2d 385, 391 (Ala.2004) (“ ‘[I]t is elementary that it is the terms of the written contract, not the *1220 mental operations of one of the parties, that control its interpretation.’ ” (quoting Kinmon v. J.P. King Auction Co., 290 Ala. 823, 325, 276 So.2d 569, 570 (1973))); Turner v. West Ridge Apartments, Inc., 893 So.2d 332, 335 (Ala.2004) (“‘[A] court should give the terms of the agreement their clear and plain meaning and should presume that the parties intended what the terms of the agreement clearly state.’ ” (quoting Ex parte Dan Tucker Auto Sales, Inc., 718 So.2d 33, 36 (Ala.1998)))....”’
Alabama Title Loans, Inc. v. White, 80 So.3d 887, 893 (Ala.2011) (quoting Title Max of Birmingham, Inc. v. Edwards, 973 So.2d 1050, 1054-55 n. 1 (Ala.2007)).
In Cook’s Pest Control, Inc. v. Boykin, 807 So.2d 524 (Ala.2001), the plaintiff sued a hospital and Cook’s, the hospital’s pest-control-services provider, alleging that while she was a patient in the hospital she had been bitten by fire ants. Cook’s produced its service contract with the hospital, which contract contained an arbitration clause, and moved to compel arbitration of the plaintiffs claims. The trial court denied the motion, and our supreme court affirmed, holding (1) that the patient was not a third-party beneficiary of the contract between the hospital and Cook’s; (2) that the patient’s claims were not intertwined with or related to the hospital’s contract with Cook’s; and (3) that “[t]he narrow scope of the arbitration agreement serves as an independent basis for affirming the trial court’s order denying Cook’s motion to compel arbitration of [the patient’s] claims against Cook’s.” 807 So.2d at 527. The court explained the third holding as follows:
“The text of the arbitration clause limits its application to disputes arising between Cook’s and the ‘customer’ [the hospital].... This Court has held that a nonsignatory cannot require arbitration of a claim by the signatory against the nonsignatory when the scope of the arbitration agreement is limited to the signatories themselves. See Southern Energy Homes, Inc. v. Gary, 774 So.2d 521 (Ala.2000). Here, a signatory (Cook’s) is trying to require arbitration by a non-signatory [the patient], where the scope of the arbitration agreement can be read as being limited to disputes between Cook’s and [the hospital]. We have recognized that the rule requiring that a contract be construed most strongly against the party who drafted it applies to an agreement to arbitrate. See Homes of Legend, Inc. v. McCollough, 776 So.2d 741 (Ala.2000). We conclude that Cook’s is attempting to enforce the clause beyond its scope, and the motion to compel arbitration fails for this reason. Although [the patient] did not raise this in her arguments to this Court, we can affirm the trial court’s order for any valid legal reason. See Smith v. Equifax Servs., Inc., 537 So.2d 463, 465 (Ala.1988).”
Id. (emphasis added).
We hold that the second arbitration agreement is limited to disputes between the lender and the borrower, and, therefore, it “is not susceptible of an interpretation that [it] covers the asserted dispute” between the lender and the borrower’s shareholder or the lender and the borrower’s guarantor. See Ex parte Colquitt, 808 So.2d 1018, 1024 (Ala.2001) (“[A] motion to compel arbitration should not be denied ‘unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.’ ” (quoting United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960))).
Despite the fact that the circuit court did not consider the second arbitration agreement, our de novo review convinces us that the circuit court’s ultimate conclusion — that no agreement required *1221 Thomas to arbitrate his claims against the lenders — was correct. “[An appellate court] can affirm a trial court’s judgment for any reason, even one not contemplated by the trial court. See Turner v. Westhampton Court, L.L.C., 903 So.2d 82, 88 (Ala.2004) (‘This Court can affirm a trial court’s judgment for any reason, but only if the record on appeal evidences the fact that is the basis for the affirmance.’) (citing Ex parte Ryals, 773 So.2d 1011, 1013 (Ala.2000)).” Carroll v. W.L. Petrey Wholesale Co., 941 So.2d 234, 240 n. 6 (Ala.2006).
Our disposition of the first two issues raised by the lenders makes it unnecessary to reach the third issue. Accordingly, the judgment of the Jefferson Circuit Court is affirmed.
AFFIRMED.
THOMPSON, P.J., and BRYAN, THOMAS, and MOORE, JJ., concur.

. The circuit court concluded that the jury-waiver provision in Thomas's guaranty agreement was valid for any claim arising under that agreement and depending for its resolution upon a reference to or a construction of the guaranty agreement. The circuit court further concluded that only Thomas’s fraud-in-the-inducement claim did not arise under the guaranty agreement and that it alone could, therefore, be tried by a jury.

. The original deadline for filing the notice of appeal would have been June 13, 2011 — 42 days after May 2, 2011. Rule 77(d) allows a trial court to extend the time to file the notice of appeal for an additional 30 days after the expiration of the 42-day period. The 30th day after June 13, 2011, was July 13, 2011.

. See Ex parte Hood, 712 So.2d 341, 344 (Ala.1998), and Companion Life Ins. Co. v. Whitesell Mfg., Inc., 670 So.2d 897, 900-01 (Ala.1995), both citing Cabinetree of Wisconsin, *1214 Inc. v. Kraftmaid Cabinetry, Inc., 50 F.3d 388, 390-91 (7th Cir.1995).

. The intertwined-claims theory is not applicable here.
"Intertwining is ‘where nonarbitrable claims are considered so intimately founded *1215 in and closely related to claims that are subject to the arbitration agreement that the party opposing arbitration is equitably estopped to deny the arbitrability of the related claims.' Ex parte Tony’s Towing, Inc., 825 So.2d 96, 97 (Ala.2002). This exception is applicable when a nonsignato-ry to the arbitration agreement attempts to claim the benefit of the arbitration agreement and to compel a signatory to arbitrate claims involving the signatory and nonsig-natory. See, e.g., Lewis v. Oakley, 847 So.2d 307 (Ala.2002); Ex parte Napier, 723 So.2d 49 (Ala.1998). It is not applicable, however, when [as in the present case,] a signatory attempts to compel a nonsignatory third party to arbitrate claims it may have against a signatory. [Our supreme court] explained the rationale for this distinction in Ex parte Tony's Towing [, 825 So.2d at 98]:
" ‘We have heretofore addressed the doctrine of intertwining in situations where a nonsignatory to an arbitration agreement seeks arbitration over the objection of the signatory. In this case a signatory to the arbitration agreement seeks arbitration over the objection of the nonsignatory. [The signatory] argues that what is “sauce for the goose, is sauce for the gander." In other words, she argues that- if a nonsignatory can compel a plaintiff to arbitrate, then denying the plaintiff the right to compel a nonsignato-ry defendant to arbitrate is unfair. However, this argument skips over the critical and essential element of estoppel as the basis for the theory of intertwining. Here, [the nonsignatoiy] has never agreed to arbitrate anything and, therefore, it is not estopped from avoiding arbitration.’ ”
Edwards v. Costner, 979 So.2d 757, 764 (Ala.2007) (emphasis and bracketed language added).

. We are not precluded from considering the matter for the first time on appeal because issues concerning arbitrability, " 'including] those relating to the scope, interpretation, and application of the arbitration agreement,’ ” are questions of law, for which our review is de novo. See Ernst & Young, LLP v. Tucker, 940 So.2d 269, 281 (Ala.2006) (quoting Polaris Sales, Inc. v. Heritage Imports, Inc., 879 So.2d at 1133, citing in turn Jim *1217 Burke Auto., Inc. v. McGrue, 826 So.2d 122, 132 (Ala.2002)).