STUART, Justice.
MTA, Inc., appeals the order of the Madison Circuit Court holding that MTA’s claims against Merrill Lynch, Pierce, Fen-ner & Smith, Inc., a division of Bank of Ameriea Corporation (“Merrill Lynch”), were subject to an arbitration agreement and compelling MTA to arbitrate those claims. We reverse and remand.
I.
On January 21, 1994, MTA entered into a deferred-compensation agreement (“the DCA”) with its employee, Yvonne Sanders. Pursuant to the terms of the DCA, MTA was obligated to pay Yvonne $270,000 in 120 equal monthly installments beginning the month following her 50th birthday or, in the event Yvonne died before reaching her 50th birthday, to pay her children, Tiffany Sanders and Roderick Dedrick, a total of $750,000 in 120 equal monthly installments beginning the month after her death. MTA thereafter obtained a $1,000,000 life-insurance policy on Yvonne to fund the death benefit provided in the DCA in the event it became payable.
On October 22, 1999, Yvonne died at the age of 43. For all that appears, MTA thereafter received the $1,000,000 it was owed under the life-insurance policy; however, MTA did not promptly begin making payments to Tiffany and Roderick as called for by the DCA. Instead, it appears that MTA was asked on behalf of Tiffany and Roderick to establish a rabbi trust to handle the payments, presumably to allow for more favorable tax treatment for Tiffany and Roderick.[1] Accordingly, MTA thereafter executed a trust agreement with Thomas W. Dedrick, Sr., Tiffany and Roderick’s uncle and a licensed broker employed by Merrill Lynch, establishing the trust and depositing into it an initial sum of $506,450. The trust agree- *29 raent also provided that Thomas would act as trustee of the trust.
On January 18, 2001, Thomas opened a brokerage account (the working-capital-management account or “the WCMA account”) with Merrill Lynch to house and manage the assets of the trust. The account-authorization form states on its face that it was entered into by Merrill Lynch and “Thomas W. Dedrick, Sr. TTEE UAD 1/1/2000 by MTA, Inc.” on behalf of the entity identified as “Trust — Deferred Comp[ensation] Plan” and executed by Thomas as the trustee.[2] The account-authorization form also provided that Thomas agreed, on behalf of the trust, to all the terms and conditions of the agreement governing the WCMA account (“the WCMA agreement”) and specifically states that, “in accordance with paragraph 16 on page 9 of the WCMA agreement, we agree, on behalf of the above named entity [the trust] to arbitrate any controversies which may arise with [Merrill Lynch].” Paragraph 16 of the WCMA agreement specifically states that “[t]he parties are waiving their right to seek remedies in court, including the right to jury trial” and that
“[t]he customer agrees that all controversies that may arise between the customer and [Merrill Lynch], including, but not limited to, those involving any transaction or the construction, performance or breach of this or any other agreement between the customer and [Merrill Lynch], whether entered into prior to, on or subsequent to the date hereof, shall be determined by arbitration.”
The WCMA agreement further defines “the customer” as “the business or organization on whose behalf the WCMA account authorization form is signed” — in this case, the trust. That same day, Thomas also executed a client agreement with Merrill Lynch that contained a substantially similar arbitration provision, the only potentially relevant difference being that it was between “the client” and Merrill Lynch. The agreement did not define “the client”; however, the signature block contained a line for the “Name of Client if different from name of signatory.” This line was not filled out on the client agreement completed by Thomas, which he executed in his own name, noting his title as “trustee.” It is undisputed that nobody affiliated with MTA signed any documents with Merrill Lynch.
It appears that, subsequent to the creation of the trust, some intermittent payments were made from the trust to Tiffany and Roderick before payments ceased in approximately October 2009. However, the sum total of the payments made did not equal $750,000, and, on June 28, 2011, Tiffany and Roderick filed an action against MTA asserting breach-of-contract and unjust-enrichment claims and seeking $213,777, the amount they allege was still due them pursuant to the DCA. On November 27, 2011, MTA filed a third-party complaint against Thomas and Merrill Lynch, asserting claims for indemnification and alleging breach of fiduciary duty, negligence, and wantonness. The gravamen of those claims was described in the third-party complaint as follows:
“MTA has discovered that [Thomas] has breached the trust agreement and his obligations thereunder by among other matters investing in products which given the requirements of the trust were improper. Specifically, [Thomas] with knowledge of the purpose *30 and payout obligations of the trust breached this trust by failing to abide by the payment schedule and by choosing to invest in products which caused unnecessary loss of income to the trust. Instead of choosing an investment approach which could have achieved the goals and purposes of the trust, [Thomas], through his acts or omissions or a combination of both breached the trust. Moreover, [Thomas] breached the trust agreement by failing to report the payments made from the trust as income and failed to provide the necessary tax statement to MTA.”
On February 3, 2012, Merrill Lynch moved the trial court to compel arbitration of MTA’s claims against it pursuant to the arbitration provisions in the account-authorization form, the WCMA agreement, and the client agreement. MTA opposed that motion, arguing that it was not a party to those contracts, and, following a hearing on the matter, both Merrill Lynch and MTA submitted additional briefs in support of their positions. On March 29, 2012, the trial court granted Merrill Lynch’s motion to compel arbitration and dismissed MTA’s third-party claims against Merrill Lynch. MTA’s subsequent motion to alter, amend, or vacate the trial court’s order was denied on April 30, 2012, and MTA thereafter filed a timely notice of appeal to this Court.
II.
The standard of review we apply to an order granting a motion to compel arbitration is well settled:
“We conduct a de novo review of a trial court’s order compelling arbitration. Smith v. Mark Dodge, Inc., 934 So.2d 375, 378 (Ala.2006).
“ ‘The party seeking to compel arbitration must first prove both that a contract calling for arbitration exists and that the contract evidences a transaction involving interstate commerce .... Once this showing has been made, the burden then shifts to the nonmovant to show that the contract is either invalid or inapplicable to the circumstances presented.’
“Smith, 934 So.2d at 378.”
Ritter v. Grady Auto. Group, Inc., 973 So.2d 1058, 1060-61 (Ala.2007). Neither MTA nor Merrill Lynch disputes that the identified contracts containing arbitration provisions — the account-authorization form, the WCMA management agreement, and the client agreement — involve interstate commerce; therefore, the only issue before this Court is whether MTA, which is not a signatory to those contracts, should be bound by those contracts.
III.
In Custom Performance, Inc. v. Dawson, 57 So.3d 90, 97 (Ala.2010), this Court noted that arbitration is a matter of contract and, accordingly, that a court cannot require a party to arbitrate claims the party has not previously agreed to arbitrate. Hence, the general rule that “ ‘ “a nonsignatory to an arbitration agreement cannot be forced to arbitrate [its] claims.” ’ ” Id. (quoting Edward D. Jones & Co. v. Ventura, 907 So.2d 1035, 1042 (Ala.2005), quoting in turn Cook’s Pest Control, Inc. v. Boykin, 807 So.2d 524, 526 (Ala.2001)). Nevertheless, we did recognize two exceptions to this general rule.[3] *31 The first is the third-party-beneficiary exception, which provides that “[a] nonsigna-tory can be bound to an arbitration agreement if ‘the contracting parties intended, upon execution of the contract, to bestow a direct, as opposed to incidental^] benefit upon the third party.’ ” Custom Performance, 57 So.3d at 97 (quoting Dunning v. New England Life Ins. Co., 890 So.2d 92, 97 (Ala.2003)). The second exception is closely related and provides that a nonsig-natory to a contract having an arbitration agreement will be treated as a third-party beneficiary of the contract regardless of whether the nonsignatory meets the legal definition of a third-party beneficiary “when he or she asserts legal claims to enforce rights or obtain benefits that depend on the existence of the contract that contains the arbitration agreement.” Custom Performance, 57 So.3d at 98 (emphasis omitted). This exception is referred to as the equitable-estoppel exception because of the inequity that would result if a party were allowed to simultaneously claim the benefits of a contract while repudiating its burdens and conditions.
In the instant case, Merrill Lynch has argued to both the trial court and this Court that MTA should be required to arbitrate its claims against Merrill Lynch based on the equitable-estoppel exception. MTA argues that it has asserted only tort claims against Merrill Lynch and that it accordingly would be inappropriate to apply the equitable estoppel exception because MTA is not suing to enforce a contract while simultaneously disclaiming a contractual provision requiring the arbitration of such claims. As an initial matter, we note that this Court has on some previous occasions applied the equitable-estoppel exception to require the arbitration of claims asserted by a nonsignatory to a contract calling for arbitration even when the nonsignatory’s claims sound in tort. See, e.g., Olshan Found. Repair Co. of Mobile, LP v. Schultz, 64 So.3d 598, 609 (Ala.2010), in which this Court held that a nonsignatory plaintiffs negligence and wantonness claims were nevertheless dependent on contracts containing arbitration provisions executed by the nonsigna-tory plaintiffs husband. Indeed, in Ol-shan we held that a factual determination must be made in each case to determine whether a nonsignatory’s claims, though at least nominally tort claims, depend upon the existence of a related contract containing an arbitration provision. 64 So.3d at 609. Nevertheless, in this case it is ultimately unnecessary for us to conduct that inquiry because, even if we were to conclude that MTA’s claims against Merrill Lynch were dependent on one of the identified contracts containing an arbitration provision, none of those arbitration provisions are broad enough to encompass this dispute.
In Cook’s, a pest-control company moved the trial court to require a patient in a hospital who was bitten by fire ants while in the hospital to arbitrate her claims against the pest-control company based on an arbitration provision in the contract between the hospital and the pest-control company. 807 So.2d at 525. The trial court denied the motion, and, on appeal, this Court affirmed that decision, declining to apply the third-party-beneficiary or equitable-estoppel exception and noting that, “under the facts of this present case, it appears [the nonsignatory hospital-patient *32 plaintiff] relies on theories of recovery that do not depend upon the existence of the contract.” 807 So.2d at 527. However, the Court further explained that the narrow scope of the arbitration provision in the contract between the pest-control company and the hospital also precluded enforcing that provision against the plaintiff, stating:
“The narrow scope of the arbitration agreement serves as an independent basis for affirming the trial court’s order denying [the pest-control company’s] motion to compel arbitration of [the plaintiffs] claims against [the pest-control company]. The text of the arbitration clause limits its application to disputes arising between [the pest-control company] and the ‘customer’ ([the hospital] ).... This Court has held that a nonsignatory cannot require arbitration of a claim by the signatory against the nonsignatory when the scope of the arbitration agreement is limited to the signatories themselves. See Southern Energy Homes, Inc. v. Gary, 774 So.2d 521 (Ala.2000). Here, a signatory ([the pest-control company]) is trying to require arbitration by a nonsignatory ([the plaintiff]), where the scope of the arbitration agreement can be read as being limited to disputes between [the pest-control company] and [the hospital]. We have recognized that the rule requiring that a contract be construed most strongly against the party who drafted it applies to an agreement to arbitrate. See Homes of Legend, Inc. v. McCollough, 776 So.2d 741 (Ala.2000). We conclude that [the pest-control company] is attempting to enforce the clause beyond its scope, and the motion to compel arbitration fails for this reason.”
807 So.2d at 527. See also Porter Capital Corp. v. Thomas, 101 So.3d 1209, 1220 (Ala.Civ.App.2012) (holding that an arbitration agreement limited to disputes between “lender” and “borrower” was not susceptible to an interpretation that would have the agreement cover a dispute between the lender and the borrower’s shareholder or the lender and the borrower’s guarantor), and Ex parte Stamey, 776 So.2d 85, 90-91 (Ala.2000) (comparing limiting arbitration provision applying to “ ‘all disputes and controversies of every kind between buyer and seller arising out of or in connection with [this transaction]’ ” with broader nonlimiting provision applying to “ ‘[a]ll disputes, claims or controversies arising from or relating to this Contract or the relationships which result from this Contract’ ” (some emphasis omitted)).
In the instant case, the arbitration provisions in the identified contracts are broad in the sense that they apply to “any controversies” and “all controversies,” but narrow in the sense that they apply only to controversies between “the parties,” “the customer” and Merrill Lynch, or “the client” and Merrill Lynch. The contracts containing the arbitration provisions do not define the terms “the customer” or “the client” in such a way that would encompass MTA, and although Merrill Lynch argues that MTA is effectively a party to the contracts containing the arbitration provisions because it was a party to the DCA and the grantor of the trust, we disagree. Regardless of MTA’s involvement in establishing or funding the trust, it is neither the trust nor the trustee and is accordingly a nonsignatory to the contracts and can be held subject to the arbitration provisions only as set forth supra. See also Porter Capital Corp., 101 So.3d at 1209 (arbitration agreement entered into by borrower did not apply to borrower’s shareholder or borrower’s guarantor). Thus, regardless of whether the third-party-beneficiary or equitable-estoppel exception might otherwise apply, the narrow scope of the arbitration provisions in the *33 account-authorization form, the WCMA agreement, and the client agreement precludes this Court from requiring MTA to arbitrate its third-party claims against Merrill Lynch. The trial court accordingly erred by granting Merrill Lynch’s motion to compel arbitration.
IV.
After Tiffany and Roderick sued MTA alleging that it had failed to fulfill its obligations under the DCA it had entered into with their deceased mother, MTA asserted third-party claims against Thomas and Merrill Lynch alleging, essentially, that Thomas had mismanaged funds MTA had placed into a trust established on behalf of Tiffany and Roderick. The trial court subsequently entered an order granting Merrill Lynch’s motion to compel MTA to arbitrate its claims against Merrill Lynch on the basis of arbitration provisions in multiple contracts Thomas had executed with Merrill Lynch on behalf of the trust and dismissing MTA’s third-party claims against Merrill Lynch. We now reverse that order, holding that MTA was not a signatory to those contracts and that the scope of the arbitration provisions in those contracts is too narrow to encompass disputes between Merrill Lynch and other entities not a party to those contracts. The cause is accordingly remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
MALONE, C.J., and PARKER, SHAW, and WISE, JJ., concur.

. "A rabbi trust is a commonly-used mechanism for deferred compensation and deferred taxation, in which ‘[f]unds held by the trust are out of reach of the employer, but are subject to the claims of the employer’s creditors in the event of bankruptcy or insolvency.' " Kadillak v. Commissioner of Internal Revenue, 534 F.3d 1197, 1201 n. 2 (9th Cir.2008) (quoting In re IT Group, Inc., 448 F.3d 661, 665 (3d Cir.2006)).

. MTA asserts, and Merrill Lynch does not dispute, that the phrase "Thomas W. Dedrick, Sr. TTEE UAD 1/1/2000 by MTA, Inc." is commonly understood in this context to mean that Thomas is the "trustee” "under agreement dated” 1/1/2000 by MTA.

. We also noted in Custom Performance that a nonsignatory to an arbitration agreement may compel a signatory to that agreement to arbitrate claims " 'where arbitrable and nonarbi-trable claims are so closely related that the party to a controversy subject to arbitration is equitably estopped to deny the arbitrability of the related claim.’ ” 57 So.3d at 99 (quoting Conseco Fin. Corp. v. Shannon, 828 So.2d 890, 893 (Ala.2001)). However, this "intert *31 wining-claims doctrine” does not provide an exception to the general rule that a nonsigna-tory to an arbitration agreement will not be forced to arbitrate its claims because the doctrine can be asserted only by a nonsignatory against a signatory and not vice versa. See Ex parte Tony’s Towing, Inc., 825 So.2d 96, 97 (Ala.2002) (explaining the rationale for allowing only nonsignatories to assert the intertwining-claims doctrine).