PARKER, Justice.
Dannelly Enterprises, LLC (“Dannelly”), appeals the order of the Dale Circuit Court (“the circuit court”) granting a motion to compel arbitration filed by Palm Beach Grading, Inc. (“PBG”). We reverse the circuit court’s order.

Facts and Procedural History

In the fall of 2006, PBG entered into negotiations with Corvias Military Living, LLC, f/k/a Picerne Military Housing LLC (“Corvias”); Picerne Construction/FRK, LLC; Rucker-Picerne Partners, LLC; and Rucker Communities, LLC (hereinafter collectively referred to as “the contractors”), to perform work on a project known as the Ft. Rucker RCI Family Housing, Munson Heights, Phase 1A, at Fort Ruck-er, Alabama (“the project”). Apparently, in preparing to bid on the project, PBG contacted various subcontractors, including Dannelly, to get bids for various aspects of the project that PBG would be responsible for if it entered into an agreement with the contractors to complete the project. PBG *1159 had not signed any agreement with the contractors at that time.
PBG requested that Dannelly submit a bid for the construction of four segmental retaining walls and an associated drainage system. On September 21, 2006, Dannelly submitted a bid to PBG. On or about September 26, 2006, PBG accepted Dannelly’s bid by issuing a work order to Dannelly; the work order was signed by a representative of PBG and by David Dannelly, the managing member of Dannelly. Neither the bid submitted by Dannelly nor the work order issued by PBG contained an arbitration provision.
Although the work order issued by PBG stated that “[a] Sub-contract will be created by PBG for billing purposes,” neither party submitted into evidence such a contract between PBG and Dannelly. PBG did submit the affidavit testimony of Gene Eichelberger, the manager of PBG, in which Eichelberger stated that PBG and Dannelly had entered into PBG’s “standard subcontract agreement”; PBG’s standard subcontract agreement contains an arbitration agreement. However, PBG did not submit to the circuit court a copy of its standard subcontract agreement signed by PBG and Dannelly, In fact, Eichelber-ger’s affidavit testimony states that “PBG has not at this time been able to locate signed copies of the PBG [subcontract [ajgreement” with Dannelly. In direct contradiction to Eichelberger’s affidavit testimony, David Dannelly’s affidavit testimony states that Dannelly “has not entered into or agreed to be bound by the terms and conditions [of PBG’s standard subcontract agreement], including any arbitration provision, within [PBG’s] standard [subcontract [a]greement.”
On October 20; 2006, PBG, apparently having won the right to act as subcontractor for the project, entered into a “master subcontract agreement” with Corvias for the completion of the project (“the master subcontract agreement”). The master subcontract agreement contains the following arbitration provision:
“7.5. Disputes. If [PBG] is not'satisfied with the decision on a Claim,[1] or in the event of any other dispute between [Corvias] and [PBG] arising under or relating to this Agreement, the dispute shall be settled pursuant to the following procedures.
“7.5.1. Any Claim arising out of or relating to the Agreement, but only at the election of [Corvias], may be subject to non-binding mediation in accordance with the Construction Industry Mediation Rules of the American Arbitration Association. If [Corvias] elects non-binding mediation, [PBG] agrees to mediate the disputed portions of its Claim, with the parties agreeing to share all mediator and filing fees equally. [PBG] shall not have the right to seek non-binding mediation of any Claim over the objection of [Corvias]. If mediation is elected by [Corvias], mediation shall be a condition precedent to any arbitration proceeding held pursuant to Paragraph 7.5.2.
“7.5.2. If [PBG] is not satisfied with [Corvias’s] decision on a Claim, and that Claim is not resolved through non-binding mediation, if any, the dis *1160 pute shall be settled pursuant to binding arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then in effect, unless the parties agree otherwise. The parties agree that there will be no recourse to trial or appeal courts, except as may be allowed by law, and that their exclusive recourse and remedy is ARBITRATION. This agreement to arbitrate shall be specifically enforceable under the prevailing arbitration law of the State of Rhode Island. An award of reasonable attorneys’ fees and related arbitration costs shall be awarded to the party that prevails at the binding arbitration.
“7.5.3. [PBG] agrees to include in any. and all of its subcontracts and purchase orders the same provisions as are included in this Paragraph 7.5 and its subparts, modified only as to the appropriate identification of the parties.”
(Capitalization in original.)
On May 3, 2013, the contractors sued PBG. Neither party explains what took place between the time PBG and the contractors entered into the master subcontract agreement and the time the contractors sued PBG. In their complaint against PBG, the cóntractors allege that, “[o]n or about April 9, 2013, the collapse of one retaining 'wall on the [p]roject was discovered. In addition, it has been discovered that there is movement from vertical bulging in at least one other retaining wall on the projéct.” The contractors alleged that the problems with the retaining walls are evidence that PBG breached the master subcontract agreement. Accordingly, the contractors asserted claims of breach of contract and negligence against PBG.
The contractors and PBG filed a joint motion for the action to be held in abeyance “pending further analysis of the issues central to the [cjomplaint filed herein, and discussions between and among the [p]arties.” The circuit court granted the contractors and PBG’s joint motion.
On August 14, 2014, the contractors filed a motion to stay the proceedings and to compel arbitration of their claims 'against PBG. The circuit court granted the contractors’ motion to stay and to compel arbitration on the same day. On August 22, 2014, PBG filed a motion to reconsider the circuit court’s order granting the contractors’ motion to compel arbitration. On September 22, 2014, the circuit court entered an order indicating that the contractors and PBG had reached an agreement to partially lift the stay entered by the circuit court on August 14, 2014, “for the sole and limited purpose of allowing PBG to file and serve a third party complaint against its appropriate subcontractors.” The circuit court’s order also stated that, “[o]nce service of the third party complaint has been effected upon PBG’s subcontractors, PBG will file notice of service-with the court and the court will issue an order applying the stay to the third party complaint and third party defendants.” Lastly, the circuit court’s order states that the contractors and PBG “will jointly file with the American Arbitration Association (‘AAA’) a motion for joinder, pursuant to AAA Construction Industry Arbitration Rule 7, to join in the arbitration all claims asserted in this matter, all Plaintiffs, and PBG’s subcontractors.”
On September 22, 2014, PBG filed a third-party complaint against Dannelly and Scott Miller Consulting Engineer, Inc. (“SMCE”),[2] alleging negligence, breach of contract, “third-party beneficiary,” “com *1161 mon-law indemnity,” and breach of implied warranty. Dannelly answered the third-party complaint filed against it on November 10, 2014.
On December 1, 2014, PBG filed a motion to compel arbitration of its third-party claims against Dannelly and SMCE. PBG argued that Dannelly and SMCE are bound by the arbitration provision in the master subcontract agreement. PBG also argued that Dannelly and SMCE “agreed to the arbitration provisions contained in the PBG [subcontract [a]greement” and, thus, are bound by that arbitration provision.[3] PBG acknowledged that neither Dannelly nor SMCE signed the master subcontract agreement or the PBG standard subcontract agreement but' argues that Dannelly and SMCE performed work under those agreements, demanded payment under those agreements, and were paid for their work under those agreements; PBG submitted no evidence in support of these assertions. PBG argued that “[p]arties cannot avail themselves of the benefits of an agreement while at the same time avoiding the arbitration provisions contained in those agreements.”
On December 31, 2014, Dannelly filed a response in opposition to PBG’s motion to compel arbitration. Dannelly argued that it is not a signatory to any agreement requiring arbitration, that it is not a third-party beneficiary under the master subcontract agreement, and that the arbitration provision in the master subcontract agreement is too narrow to encompass PBG’s third-party claims against Dannelly.
On January 9, 2015, after holding a hearing on January ⅞ ’ 2015, the circuit court granted PBG’s .motion to compel arbitration. Dannelly appeals.

Standard of Review

“ ‘[T]he standard of review of a trial court’s ruling on a motion to compel arbitration at the instance of either party is a de novo determination of whether the trial judge erred on a factual or legal issue to the substantial prejudice of the party seeking review.’ Ex parte Roberson, 749 So.2d 441, 446 (Ala.1999). Furthermore: ’
“‘A motion to compel arbitration is analogous to a motion for summary judgment. TranSouth Fin. Corp. v. Bell, 739 So.2d 1110, 1114 (Ala.1999). The party seeking to compel arbitration has the burden of proving the existence of a contract calling for arbitration and proving that that contract evidences a transaction affecting interstate commerce. Id. “After a motion to compel arbitration has been made and supported, the burden is on the non-movant to present evidence that the supposed arbitration agreement is not valid or does not apply to the dispute in question.” ’
“Fleetwood Enters., Inc. v. Bruno, 784 So.2d 277, 280 (Ala.2000) (quoting Jim Burke Auto., Inc. v. Beavers, 674 So.2d *1162 1260, 1265 n. 1 (Ala.1995) (emphasis omitted)).”
Vann v. First Cmty. Credit Corp., 834 So.2d 751, 752-53 (Ala.2002).

Discussion

The sole issue in this ease is whether Dannelly agreed to arbitrate PBG’s third-party claims against Dannelly. PBG, as the party seeking to compel arbitration, has “the initial burden of proving the existence of a contract calling for arbitration and of proving that the contract evidences a transaction affecting interstate commerce.” Bear Stearns Sec., Inc. v. Jones, 789 So.2d 161, 164 (Ala.2000). The parties do not dispute the fact that the transaction at issue in this case affects interstate commerce.
Dannelly argues that PBG has not met its burden of proving the existence of a contract providing for arbitration. Dan-nelly argues that there is no signed arbitration agreement requiring Dannelly to arbitrate PBG’s third-party claims against it. PBG agrees that there is no signed contract in the record requiring Dannelly to arbitrate PBG’s third-party claims against Dannelly, but PBG argues that a signed contract is not necessary. PBG asserts several theories as to why Dannelly, even though it did not sign either contract at issue in this case, may be required to arbitrate PBG’s third-party claims against Dannelly.
First, PBG argues that Dannelly’s assent to the master subcontract agreement and to PBG’s standard subcontract agreement may be “inferred from other external and objective manifestations of mutual assent.” PBG’s brief, at p. 21. In support of this argument, PBG relies primarily on Ex parte Rush, 730 So.2d 1175 (Ala.1999).
In Ex parte Rush, a pest-control company mailed a contract to Steve and Kim Rush agreeing to provide pest-control protection to the Rushes’ newly constructed home in exchange for the payment of an annual fee; the contract contained an arbitration provision. The contract designated Steve Rush as the “purchaser” and was executed by the president of the pest-control company and by the local manager of the company; neither Steve Rush nor Kim Rush signed the contract.
The Rushes later sued the pest-control company asserting various tort claims, and the company filed a motion to compel arbitration based on the arbitration provision in the contract. The Rushes argued that the arbitration provision in the contract was not binding because they had not signed the contract. The circuit court ordered the Rushes to arbitrate their claims against the pest-control company. The Rushes petitioned this Court for a writ of mandamus ordering the circuit court to vacate its order compelling them to arbitrate their claims against the pest-control company. The Rushes’ sole argument before this Court was that the circuit court erred in compelling arbitration because the Rushes had not signed the contract. This Court disagreed with the Rushes’ argument and determined that, under the particular facts of that case, the Rushes’ signatures were not necessary “to bring them within the arbitration provision set out in the [contract].” 730 So.2d at 1177.
In making its decision, this Court set forth the following applicable law:
“Whether a contract exists must be determined under general state-law contract principles, Crown Pontiac, Inc. v. McCarrell, 695 So.2d 615 (Ala.1997). The purpose of a signature on a contract is to show mutual assent, see Ex parte Holland Mfg. Co., 689 So.2d 65 (Ala.1996); Lawler Mobile Homes, Inc. v. Tarver, 492 So.2d 297 (Ala.1986); Ex parte Pointer, 714 So.2d 971 (Ala.1997); however, the existence of a contract may also be inferred from other external and *1163 objective manifestations of mutual assent. Unless a contract is required by a statute to be signed (the [Federal Arbitration Act] contains no such requirement), or by the Statute of Frauds to be in writing (the contract here is not subject to Alabama’s Statute of Frauds, Ala. Code 1975, § 8-9-2, which requires the signature of the party against whom enforcement is sought), or unless the parties agree that a contract is not binding until it is signed by both of them (there is no evidence of such an agreement), it need not be signed by the party against whom enforcement is sought, provided it is accepted and acted upon. See Paterson & Edey Lumber Co. v. Carolina-Portland Cement Co., 215 Ala. 621, 112 So. 245 (1927), wherein this Court, relying heavily on Hardwood Package Co. v. Courtney Co., 253 F. 929 (C.C.A. 4th Cir.1918), noted the general rule that, in the absence of a statutory requirement, a signature on a writing is not required in order to form a contract, provided the writing is accepted and acted upon as the agreement of the parties. The court in Hardwood Package stated:
“‘Apart from the statute of frauds, which is not set up in this case, it is well settled that if the minds of contracting parties meet at all points, and their agreement is fully set forth in an unsigned memorandum, which they both accept as correct, a binding obligation results, although it was their intention to have a formal contract prepared and signed.’
“253 F. at 930. See, also, 17A Am. Jur.2d Contracts, §§ 185, 186, 187 (1991). Conduct of one party from which the other may reasonably draw the inference of assent to an agreement is effective as acceptance. See Deeco, Inc. v. 3-M Co., 435 So.2d 1260 (Ala.1983); SGB Construction Services, Inc. v. Ray Sumlin Construction Co., 644 So.2d 892 (Ala.1994); Holland v. Continental Telephone Co. of the South, 492 So.2d 998 (Ala.1986); Lilley v. Gonzales, 417 So.2d 161 (Ala.1982). See, also, Anderson Brothers Chrysler Plymouth Dodge, Inc. v. Hadley, 720 So.2d 895 (Ala.1998) (held that the failure of a party to sign a contract where indicated next to an arbitration provision did not render the arbitration provision unenforceable); and Quality Truck and Auto Sales, Inc. v. Yassine, 730 So.2d 1164 (Ala.1999).”
730 So.2d at 1177-78. This Court then concluded that the Rushes had accepted and acted upon the contract:
“The record indicates that the Rushes are joint owners of the house serviced by [the pest-control company]; that [the pest-control company] mailed the [contract] to the Rushes; that the Rushes received that contract; that the contract specifically designated Steve Rush as a ‘Purchaser’; that the Rushes paid an annual fee to [the pest-control company] for 9 or 10 years; that both Steve Rush and Kim Rush signed as a ‘Customer’ on ‘[the pest-control company’s] Reinspection Report[sj’; that the Rushes made a claim under, and substantially benefited from, the contract; and that the Rushes actively supervised the repairs [the pest-control company] undertook to make. We conclude from these facts that, as a matter of law, the Rushes agreed to the terms of the [the contract], including the arbitration provision contained therein.”
730 So.2d at 1178.
As Dannelly argues in its reply brief, Ex parte Rush is distinguishable from the present case. Unlike Ex parte Rush, there are no facts before us indicating other external and objective manifestations of mutual assent from which to infer that Dannelly accepted and acted upon the master subcontract agreement or PBG’s standard subcontract agreement. Instead, the record indicates that Dannelly per *1164 formed the work it had agreed to perform in its bid and memorialized in the work order issued by PBG, which was signed by representatives of PBG and Dannelly. PBG asserts that Dannelly performed its work on the project and submitted bills to PBG for the work Dannelly had performed “pursuant to [PBG’s] standard [subcontract [ajgreement.” PBG’s brief, at p. 24. However, PBG offers no argument as to why it believes that Dannelly was operating under the master subcontract agreement and/or PBG’s standard subcontract agreement rather than under the executed work order issued by PBG; we see nothing in the record indicating that Dannelly was operating under any agreement other than the work order issued by PBG. Accordingly, PBG’s argument that a signature from a representative of Dannelly on either the master subcontract agreement or PBG’s standard subcontract agreement is not necessary is unpersuasive. PBG’s argument does not demonstrate that a contract between PBG and Dannelly calling for arbitration exists; thus, the circuit court erred to the extent that it based its decision on this argument.
Second, PBG argues that Eichel-berger’s affidavit testimony is evidence indicating that a contract between PBG and Dannelly calling for arbitration exists.[4] Eichelberger’s affidavit testimony states that PBG’s standard subcontract agreement “was agreed to and entered into by and between” PBG and Dannelly. Eichel-berger’s affidavit testimony also indicates that PBG has been unable to locate the signed copy of the PBG standard subcontract agreement. PBG argues that this evidence is sufficient to prove the exis-fence of a contract calling for arbitration. In Jenkins v. Atelier Homes, Inc., 62 So.3d 504 (Ala.2010), this Court considered a similar situation. In Jenkins, a home-builder was sued by a customer. The homebuilder filed a motion to enforce an arbitration provision in the contract between the homebuilder and the customer. However, the homebuilder had misplaced the executed copy of the contract and, thus, could not present the contract to the circuit court in support of its motion to compel arbitration. Instead of the lost contract, the homebuilder presented the affidavit testimony of the custodian of its records. The custodian’s affidavit testimony stated, in pertinent part:
“ ‘7. The contract for construction of the residence between [the homebuilder] and the [customer] provided that [the homebuilder] would construct a residence, subject to certain terms and conditions. A true and correct copy of the unexecuted [contract] is attached hereto as Exhibit 1. The executed [contract is currently lost. I have conducted a diligent search at every place the executed [c]ontract would likely be found and have not located the [contract to date. [The homebuilder] has not intentionally or negligently lost or destroyed the [contract. A true and correct copy of the executed [e]ontract was provided to the [customer] and should be in their custody or control. I will continue to diligently search for the executed [contract and, if located, will supplement this record with the document.’ ”
Jenkins, 62 So.3d at 507. The customer did not present any evidence rebutting the custodian’s affidavit testimony. This *1165 Court concluded that, based on the affidavit testimony of the custodian alone, the homebuilder had met its initial evidentiary burden of proving that an arbitration agreement existed..
This case is similar to Jenkins. Based on the above analysis from Jenkins, we conclude that Eichelberger’s affidavit testimony satisfies PBG’s initial evidentiary burden of proving the existence of a contract calling for arbitration. Eichelber-ger’s affidavit testimony indicates that PBG and Dannelly entered into PBG’s standard subcontract agreement, but that PBG was unable to locate the executed copy of that contract. The circuit court properly concluded that PBG met its initial evidentiary burden of proving the existence of a contract calling for arbitration.
The burden then shifted to Dannelly to demonstrate that the arbitration agreement is not valid or does not apply to the dispute in question. Dannelly argues on appeal, as it did before the circuit court, that David Dannelly’s affidavit testimony is sufficient to create a genuine issue of material fact concerning whether a contract calling for arbitration exists between PBG and Dannelly. As set forth above, David Dannelly’s affidavit testimony states that Dannelly “has riot entered into or agreed to be bound by the terms and conditions [of PBG’s standard subcontract agreement], including any arbitration provision, within [PBG’s] standard [subcontract [a]greement.”
In support of its argument, Dannelly relies upon Ex parte Meadows, 782 So.2d 277 (Ala.2000). In SSC Selma Operating Co. v. Gordon, 56 So.3d 598, 603 (Ala.2010), this Court summarized and applied the relevant portion of Ex parte Meadows, as follows:
“This Court stated in Ex parte Meadows, 782 So.2d 277, 280 (Ala.2000):
“ ‘ “ ‘To make a genuine issue entitling the [party seeking to avoid arbitration] to a trial by jury [on the arbitrability question], an unequivocal denial that the agreement had been made [is] needed, and some evidence should [be] produced to substantiate the denial.’ ”
“‘[Chastain v. Robinson-Humphrey Co., 957 F.2d 851, 854 (11th Cir.1992) ] (quoting T & R Enters. v. Continental Grain Co., 613 F.2d 1272, 1278 (5th Cir.1980)).’
“In the present case, [the party seeking to avoid arbitration] filed a response to the defendants’ motions to compel arbitration and attached to the response her affidavit, in which she denied that she had signed an arbitration agreement with SSC. Under Meadows, [the party seeking to avoid arbitration’s] affidavit constitutes sufficient evidence that the arbitration agreement did not exist. Therefore, a genuine issue of material fact has been raised concerning the existence of the arbitration agreement. ‘If the party opposing, arbitration presents sufficient evidence to create a fact question as to the existence of a valid arbitration agreement, then the issue must be resolved by the trial court or by a jury, if one is requested.’ Ex parte Caver, 742 So.2d [168,] 172 n. 4 [ (Ala.1999) ].”
In the present case, David Dannelly’s unequivocal denial of the existence of an executed copy of PBG’s standard subcontract agreement was sufficient to raise a genuine issue of material fact as to whether a contract calling for arbitration exists. Based on the competing affidavits of Ei-chelberger and David Dannelly, a genuine issue of material fact exists as to whether PBG and Dannelly entered into PBG’s standard subcontract agreement.[5] PBG’s *1166 argument does not demonstrate that a contract between PBG and Dannelly calling for arbitration exists, only that a genuine question - of material fact exists as to whether'PBG and Dannelly entered into PBG’s standard: subcontract agreement. Accordingly, the circuit court erred to the extent that' it based its decision to grant PBG’s motion to compel arbitration on this argument of PBG’s.
Third, PBG argues that Dannelly is a third-party beneficiary of the master subcontract agreement and, as such, is subject to its arbitration provision.[6] In UBS Financial Services, Inc. v. Johnson, 943 So.2d 118, 122 (Ala.2006), this Court explained the third-party-beneficiary exception to the general rule that a nonsig-natory cannot be bound by an arbitration agreement:
“This Court has held that a nonsigna-tory can be bound by an arbitration provision when the nonsignatory is an intended third-party beneficiary of the contract containing the arbitration provision. See Edward D. Jones & Co. v. Ventura, 907 So.2d 1035 (Ala.2005), and Ex parte Dyess, 709 So.2d 447 (Ala.1997). ‘[I]n order for a person to be a third-party beneficiary of a contract, the contracting parties must have intended to bestow benefits on third parties.’ Locke v. Ozark City Bd. of Educ., 910 So.2d 1247, 1251 (Ala.2005) (citing H.R.H. Metals, Inc. v. Miller, 833 So.2d 18, 24 (Ala.2002)); see also Ex parte Stamey, [776 So.2d 85 (Ala.2000) ] (holding that the intent of the parties as expressed in the contract determines whether a nonsignatory is a third-party beneficiary).”
PBG does not argue that it and Corvias intended to bestow upon Dannelly a benefit when they entered into the master subcontract agreement, but only that Dannelly generally benefited from the master subcontract agreement in the sense that Dannelly was hired as a subcontractor of PBG’s to complete certain work on the project. Thus, PBG argues, Dannelly is bound by the arbitration provision in the master subcontract agreement.
Dannelly, relying upon MTA, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 114 So.3d 27 (Ala.2012), argues that, regardless of whether the third-party-beneficiary exception applies in this case, the arbitration provision in the master subcontract agreement is too narrow to encompass PBG’s third-party claims against Dannelly. In MTA, an employer entered into a deferred-compensation agreement with its employee wherein the employer agreed to pay $750,000 to the employee’s two children in the event the employee died before reaching her 50th birthday; the employee died at the age of 43. The employer then paid an amount less than $750,000 into a trust established for the benefit of the employee’s children. The trustee of the trust had entered into three agreements with a brokerage firm to open an account into which the trustee deposited the money received from the employer; each of those agreements included an arbitration provision. The -employer never paid the children the full $750,000.
The employee’s children sued the employer to recover the entire $750,000 owed them. The employer filed a third-party complaint against the trustee and the brokerage firm. The brokerage firm then *1167 filed a motion to compel arbitration of the employer’s third-party claims based on the agreements between the trustee and the brokerage firm to which the employer was not a signatory. The circuit court granted the brokerage firm’s motion to compel arbitration. The employer appealed.
This Court reversed thq circuit court’s order compelling the employer to arbitrate its third-party claims against the trustee and the brokerage firm. In so doing, this Court set forth
“the general rule that ‘ “ ‘a nonsignatory to an arbitration agreement cannot be forced to arbitrate [its] claims.’ ” ’ [Custom Performance, Inc. v. Dawson, 57 So.3d 90, 97 (Ala.2010)] (quoting Edward D. Jones & Co. v. Ventura, 907 So.2d 1035, 1042 (Ala.2005), quoting in turn Cook’s Pest Control, Inc. v. Boykin, 807 So.2d 524, 526 (Ala.2001)).”
114 So.3d at 30. After setting forth the third-party-beneficiary exception explained above, this Court determined that it was irrelevant whether the third-party-beneficiary exception applied in that case because the arbitration provisions in the agreements between the trustee and the brokerage firm were too narrow to encompass the claims of any party other than the trustee and the brokerage firm. This Court stated:
“In Cook’s [Pest Control, Inc. v. Boykin, 807 So.2d 524 (Ala.2001)], a pest-control company moved the trial court to require a patient in a hospital who was bitten by fire ants while in the hospital to arbitrate her claims against the pest-control company based on an arbitration provision in the contract between the hospital and the pest-control company. 807 So.2d at 525. The trial court denied the motion, and, on appeal, this Court affirmed that decision, declining to apply the third-party-beneficiary or equitable-estoppel exception[7] and noting that, ‘under the facts of this present case, it appears [the nonsignatory hospital-patient plaintiff] relies on theories of recovery that do not depend upon the existence of the contract.’ 807 So.2d at 527. However, the Court further explained that the narrow scope of the arbitration.provision in the contract between the pest-control company and the hospital also precluded enforcing that provision against the plaintiff, stating:
“ ‘The narrow scope of the arbitration agreement serves as an independent basis for affirming the trial court’s order denying [the pest-control company’s] motion to compel arbitration of [the plaintiffs] claims against [the pest-control company]. The text of the arbitration clause limits its application. to disputes arising between [the pest-control company] and the “customer” ([the hospital]).... This Court has held that a nonsignatory cannot require arbitration of a claim by the signatory against the nonsigna-tory when the scope of the arbitration agreement is limited to the signatories themselves. See Southern Energy Homes, Inc. v. Gary, 774 So.2d 521 (Ala.2000). Here, a signatory ([the pest-control company]) is trying to require arbitration by a nonsignatory ([the plaintiff]), where the scope of the arbitration agreement can be read as being limited to disputes between [the pest-control company] and [the hospital]. We have recognized that the rule requiring that a contract be construed most strongly against the party who drafted it applies to an agreement to arbitrate. See Homes *1168 of Legend, Inc. v. McCollough, 776 So.2d 741 (Ala.2000). We conclude that [the pest-control company] is attempting to enforce the clause beyond its scope, and the motion to compel arbitration fails for this reason.’
“807 So.2d at 527. See also Porter Capital Corp. v. Thomas, 101 So.3d 1209, 1220 (Ala.Civ.App.2012) (holding that an arbitration agreement limited to disputes between ‘lender’ arid ‘borrower’ was not susceptible to an interpretation that would have the agreement cover a dispute between the lender and the borrower’s shareholder or the lender and the borrower’s guarantor), and Ex parte Stamey, 776 So.2d 85, 90-91 (Ala.2000) (comparing limiting arbitration provision applying to ‘ “all disputes and controversies of every kind between buyer and seller arising out of or in connection with [this transaction]”’ with broader nonlimiting provision applying to ‘ “[a]ll disputes, claims or controversies arising from or relating to this Contract or the relationships which result from this Contract” ’- (some emphasis omitted)).
“In the instant case, the arbitration provisions in the identified contracts are broad in the sense that they apply to ‘any controversies’ and ‘all controver- . sies,’ but narrow in the sense that they apply only to controversies between ‘the parties,’ ‘the customer’ and [the. brokerage firm], or ‘the client’ and [the brokerage firm]. The contracts containing the arbitration provisions do not define the terms ‘the customer’ or ‘the client’ in such a way that would encompass [the employer], and although [the brokerage firm] argues that [the employer] is effectively a party to the contracts containing the arbitration provisions because it was a party to the [agreement between the employer and the employee] and the grantor of the trust, we disagree. Regardless of [the employer’s] involvement in establishing or funding the trust, it is neither the trust nor the trustee and is accordingly a nonsignatory to the contracts and can be held subject to the arbitration provisions only as set forth supra. See also Porter Capital Corp., 101 So.3d at 1209 (arbitration agreement entered into by borrower did not apply to borrower’s shareholder or borrower’s guarantor). Thus, regardless of whether the third-party-beneficiary ... exception might otherwise apply, the narrow scope of the arbitration provisions in the [agreements between the trustee and the brokerage firm] precludes this Court from requiring [the employer] to arbitrate its third-party claims against [the brokerage firm]. The trial court accordingly erred by granting [the brokerage firm’s] motion to compel arbitration.”
114 So.3d at 31-33.
The present case is very similar to MTA. In fact, the scope of the arbitration provision in the master subcontract agreement is even narrower than the scope of the arbitration provision at issue in MTA. As set forth above, the arbitration provision in the master subcontract agreement applies only to a “claim.” The term “claim” is defined in the master subcontract agreement as “a demand or assertion by [PBG] seeking, as a matter of right, adjustment or interpretation of [the master subcontract agreement’s] terms, payment of money, extension of time or other relief with respect to the terms of [the master subcontract agreement].” The definition of the term “claim” “also includes other disputes and matters in question between [Corvias] and [PBG] arising out of or relating to [the master subcontract agreement].” (Emphasis added.) The arbitration provision also states numerous times that the arbitration provision applies to disputes “arising out of or relating to” the master subcontract agreement. Further, the arbitration provision in the master subcontract agreement makes clear that it applies to disputes between only Corvias and PBG. Lastly, the master subcontract agreement specifically requires *1169 PBG “to include in any and all of its subcontracts and purchase orders the same provisions as are included in [the master subcontract agreement], modified only as to the appropriate identification of the parties.” This clearly indicates that Corvias and PBG- did not intend for the arbitration provision in the master subcontract agreement to apply to any party other than the signatories to the master subcontract agreement — Corvias and PBG.
Given all of these facts, as was the case in MTA, regardless of whether Dannelly is a third-party beneficiary of the master subcontract agreement, the narrow scope of the arbitration provision in the master subcontract agreement precludes Dannelly from being required to arbitrate PBG’s third-party claims, against it. As a result, we need not consider whether the third-party-beneficiary exception applies in this case. This argument of PBG’s also fails to demonstrate that the arbitration provision in the master subcontract agreement applies to the third-party claims it filed against Dannelly. Accordingly, the circuit court erred to the extent that it based its decision to grant PBG’s motion to compel arbitration on this argument of PBG’s.
Lastly, we note that PBG argues that Dannelly cannot accept the benefit of the master subcontract agreement and PBG’s standard subcontract agreement, while avoiding the burdens or limitations of those contracts. PBG cites Georgia Power Co. v. Partin, 727 So.2d 2 (Ala.1998), in support of its argument; Partin, however, is distinguishable. In Partin, signatories to a contract were sued by a nonsignatory alleging, among other things, breach of contract; the contract contained an arbitration provision. The signatories then filed a motion to compel arbitration arguing that the nonsignatory could not accept the benefit of the contract — by suing on a breach-of-contract theory — and avoid the burdens of the contract — which included the arbitration provision. The circuit court granted the signatories’ motion. The nonsignatory appealed the circuit court’s judgment, arguing that it was not a signatory to the contract and, thus, that it could not be compelled to arbitrate its claims under the contract. This Court affirmed the circuit court’s judgment, holding, in pertinent part:
“It is a well-established principle of Alabama law that, a contract made for the benefit of a third person may, at his election, be accepted and enforced by him. Michie v. Bradshaw, 227 Ala. 302, 149 So. 809 (1933). However, ‘[i]f he claims the benefits [of the contract], he also assumes the burdens.’ Michie, 227 Ala. at 308, 149 So. at 814. See, also, Ex parte Dyess, 709 So.2d 447 (Ala.1997) (nonsignatory plaintiff claiming the benefit of a contract as a third-party beneficiary is subject to arbitration agreement within that contract). ‘The law is clear that a third party beneficiary is bound by the terms and conditions of the contract that it attempts to invoke. “The beneficiary cannot accept the benefits and avoid the burdens or limitations of a contract.” ’' Interpool Ltd. v. Through Transport Mut. Ins. Ass’n Ltd., 635 F.Supp. 1503, 1505 (S.D.Fla.1985), quoting Trans-Bay Engineers & Builders, Inc. v. Hills, 551 F.2d 370, 378 (D.C.Cir.1976). See, also, Dunn Constr. Co. v. Sugar Beach Condominium Ass’n, Inc., 760 F.Supp. 1479 (S.D.Ala.1991); Lee v. Grandcor Medical Systems, Inc., 702 F.Supp. 252, 255 (D.Colo.1988) (‘A third party beneficiary must accept a contract’s burdens along with its benefits’). It is thus clear that a third-party beneficiary cannot accept the benefit of a contract, while avoiding the burdens or limitations of that contract.”
727 So.2d at 5.
In the present case, as explained above, PBG has failed to direct this Court’s atten *1170 tion to any evidence in the record indicating that Dannelly received benefits under either the master subcontract agreement or PBG’s standard subcontract agreement. As set forth above, PBG argues that Dan-nelly accepted benefits under those contracts because Dannelly was hired by PBG to perform work on the project and was paid for the work it completed. However, PBG has not presented this Court with any argument as to why it believes that Dannelly was not simply operating under and benefiting from the agreement between PBG and Dannelly, which was memorialized by the work order issued by PBG. Further, unlike in Partin, PBG, a signatory to the master subcontract agreement, sued Dannelly, a nonsignatory. This is the' exact opposite situation from that presented in Partin. PBG has failed to demonstrate that Dannelly has accepted any benefit' under the master subcontract agreement; thus, PBG’s argument is not persuasive.[8] "

Conclusion

Based on the foregoing, we conclude that PBG failed to demonstrate that .the arbitration provision in the master subcontract agreement applies to the third-party claims it asserts against Dannelly. We further conclude that there is a genuine issue of material fact as to whether Dan-nelly and PBG entered into PBG’s standard subcontract agreement. Accordingly, we reverse the circuit court’s order compelling Dannelly to arbitrate the third-party claims filed against it by PBG. We remand this case for the circuit court to conduct a jury trial, to determine whether Dannelly and PBG entered into PBG’s standard subcontract agreement.
REVERSED AND REMANDED.
STUART, BOLIN, SHAW, MAIN, WISE, and BRYAN, JJ., concur.
MURDOCK, J., concurs in the result.
. MOORE, C.J., concurs in part and dissents in part.

. "Claim” is defined as follows in the master subcontract agreement:
“7.1. Definition. A Claim is a demand or assertion by [PBG] seeking, as a matter of right, adjustment or interpretation of this Agreement’s terms, payment of money, extension of time or other relief with respect to the terms of this Agreement. The term ‘Claim’ also includes other disputes and matters in question between [Corvias] and [PBG] arising out of or relating to this Agreement. The responsibility to substantiate Claims rests with [PBG].”

. Dannelly had hired SMCE to create the engineering design for the retaining walls Dannelly constructed pursuant to its agreement with PBG.

. The arbitration provision in PBG’s standard subcontract agreement states:
"ARBITRATION. At the CONTRACTORS option, should the parties hereto fail to agree upon the valuation of any work to be added, substituted, or omitted, or upon the amount of any damages whatsoever resulting from the default of SUBCONTRACTOR, or as to the interpretation of this Contract, or as to any other matter pertaining thereto or arising thereunder, including but not limited to a determination of the occurrence of a substantial breach or repudiation by either party, any and all these matters shall be determined by arbitration in accordance with the .construction industry arbitration rules of the American Arbitration Association then in effect. This agreement to arbitrate shall be specifically enforceable under the prevailing arbitration law. The a,ward rendered by the arbitrators shall be final, and judgment may be entered upon it in any court having jurisdiction thereof.”
(Capitalization in original.)

. PBG did not make this argument before the circuit court in its motion to compel arbitration but did, of course, attach Eichelberger’s affidavit testimony to its motion to compel arbitration. We will consider this argument because "this Court will affirm a judgment for any reason supported by the record that satisfies the requirements of due process.” Smith v. Mark Dodge, Inc., 934 So.2d 375, 380 (Ala.2006) (citing Taylor v. Stevenson, 820 So.2d 810, 814 (Ala.2001)).

. We note that PBG requested a jury trial in its third-party complaint filed against Dannel-iy-

. It is necessary for us to consider this argument even though we have concluded that there is a genuine issue of material fact concerning whether Dannelly is bound by the arbitration provision in PBG’s standard subcontract agreement because Dannelly could alternatively be bound by the arbitration provision in the master subcontract agreement.

. The “equitable-estoppel exception” is another exception to the general rule that a nonsig-natory to an arbitration agreement cannot be compelled to arbitrate their claims; the equitable-estoppel exception is not relevant to this appeal.

. PBG malees a similar argument concerning PBG’s standard subcontract agreement. See PBG's brief, at p. 25. We find PBG’s argument concerning PBG's standard subcontract agreement unpersuasive for the same reasons given above concerning the master subcontract agreement.